UNITED STATES of America,

v.

Steven C. GRIFFIN, Marvin M. Rux, Andrae Scurlock, Defendants.

No. 91 CR 371.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 4, 1994.

Zaldwaynaka L. Scott, U.S. Attys. Office, Chicago, IL, for plaintiff.

George N. Leighton, Earl L. Neal & Assocs., David Carl Thomas, Chicago–Kent College of Law, Stanley L. Hill, Jennifer H. Lee, Stanley L. Hill & Assocs., Chicago, IL, for Marvin Rux.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

This is a case of a defense counsel without much of a defense to money laundering/structuring charges who tried to follow the old maxim that when the facts and the law are against you, then attack the prosecution. The problem with this tactic is that, in its purest form, it is quite outside the law. A generation ago Justice Walter Schaefer once lamented the "increasing tendency in criminal cases to try some person other than the defendant and some issue other than his guilt." *Sears v. Romiti*, 50 Ill.2d 51, 277 N.E.2d 705 (1971). His observation holds true today.

On some occasions police and prosecutorial conduct is relevant to that issue, but often the only thrust of the defense is this: the prosecution was not nice or could have done it better and so the jury ought to acquit, whether or not guilt has been proved beyond reasonable doubt. One might excuse this tactic if a judge permits its use but, in this case, I did not and, in defiance of my rulings, Stanley Hill forged ahead, and at times sought to mislead the Court.[1] He was warned I would sanction him, and I do so in this order which adjudges him guilty of contempt of court.

The bill of particulars is this.[2]

### 1.

The government called Kevin Moss to testify as an expert about the secreting of cash from illegal transactions. The government did not, however, ask this witness to examine and reach conclusions about the particular transactions in this case. The government used a different witness to do that analysis. Mr. Hill wished to attack the government for its failure to ask Mr. Moss to do this work. What relevance this has to the one issue before the jury is quite unclear, and Mr. Hill

---

1. There are some judges who would permit some of Mr. Hill's tactics. So be it. The question here is not whether the rulings were right, it is whether Mr. Hill followed them and was truthful with the Court.

2. I leave to one side the misuse of opening statement to argue the case and to misstate law (R. at 68, 70, 71, 72, 73).

asked a series of questions on this point. I sustained the objections.

Q. Now, has the government asked you as a result of your expertise to look at the transactions involving Marvin Rux?

A. No.

Ms. Scott: Judge, we've been over this.

The Court: Objection is sustained.

Q. [Mr. Hill]: I mean, you have been involved in other cases where you've been asked to look at financial transactions to see whether they were legal or not, haven't you?

Ms. Scott: Objection, Judge.

The Court: Sustained.

Not much later, Mr. Hill asked virtually the same question to which the objection had been sustained.

Q. Let me just ask you this one last question. Have you been asked to review any transactions involving Marvin Rux, sir?

Ms. Scott: Judge, objection.

The Court: Are you including—

Mr. Hill: Last Question. Any transactions involving Marvin Rux, the defendant in this case.

The Court: Come to the side.

Mr. Hill: I'll withdraw the question.

I find that the asking of the question and its withdrawal was a deliberate attempt to evade the prior ruling and raise in the mind of the jury a question that they ought not to consider. It is not repaired by withdrawing the question.

The insincerity of the tactic is made clear by what happened at the side bar. I expressed my concern that what Mr. Hill was doing was of no use to his client because the prosecutor could respond by offering, in the presence of the jury, to have Mr. Moss conduct the examination of the Rux transactions. At the end of the conference, the colloquy was:

The Court: The government is not on trial here. Whether the government asks a witness to do something or doesn't ask a witness to do something doesn't amount to a hill of beans. We all come in here with the same subpoena power and the same

ability, at least in theory, to get in evidence, and I don't want lawyers standing up in closing argument and saying, well, if they thought it was so important why didn't they ask, and they respond to you by saying, if Mr. Hill thought it was so important why didn't Mr. Hill ask, and then we have a dispute over not the defendant's guilt but which lawyers the jury likes the most.

Mr. Hill: Judge, I'd like to make a request at this point.

The Court: Now you may make your statement.

Mr. Hill: I'd like to make a request at this point. I'd like to have him review the real estate transactions in this case and make a statement as to whether or not there's money laundering.

The Court: Your request is granted.

Mr. Hill: Thank you.

But the fact is Mr. Hill did not want Mr. Moss to make an examination of the Rux papers. At the end of Mr. Moss's examination, this occurred.

Mr. Hill: ... what I'd like to do ... is that I'd like to ask him, with all of this experience and all of these investigations he's been involved in and all of these reportings and reports that he's done ... why he wasn't requested to look at this transaction and give his opinion on that ... since he's the expert in the area....

Then Mr. Lopez (representing another defendant) said he was not joining in the request for Mr. Moss to examine documents because "I'm pretty sure what the outcome would be, I would move for a severance." Without dissent, Mr. Safer (the prosecutor) said, "I gather ... nobody at this point is asking Mr. Moss to examine ..." In fact, Mr. Hill never sought Mr. Moss's services because, like Mr. Lopez, he knew what the outcome would be. Mr. Hill never had any purpose other than to pursue a line to which objections had been sustained and, in fact, misrepresented to the Court that he did want Mr. Moss to examine records.

**2.**

The government called Roger Salter, a certified financial planner, who worked in an office with defendant Marvin Rux. Both Mr. Rux and Mr. Hill knew Roger Salter before trial. Mr. Hill wanted Mr. Salter to testify about photographs of various awards and placques given to Mr. Rux and displayed on Mr. Rux's office walls. Why this had to be done is not entirely clear since Mr. Rux testified on his own behalf. But the problem with Mr. Hill's conduct with respect to this matter was the insincerity of his justifications for the evidence. Rather than state his true purpose, Mr. Hill said that the state of the office displayed in photographs was relevant to the testimony of Terrence Ferguson, an accomplice who testified for the government. A witness's descriptions of a place where conversations occurred may be relevant. Mr. Hill made this point, "[S]ome of the conversations in which Ferguson claims he participated in happened in this very office.... it's the photograph of the facts." But a photograph of what the eye sees is of no relevance here. Mr. Hill knew as did everyone in the courtroom that Terrence Ferguson is and was sightless.

**3.**

The expert the government did call instead of Kevin Moss was one John Doe.[3] Mr. Hill wanted to impeach Mr. Doe who received poor grades in college (particularly in accounting) about twenty years ago. There is nothing unreasonable about what Mr. Hill wanted to do. It was within my discretion to admit the evidence or to refuse it. And the matter was considered over a period that consumed nine pages of transcript. The ruling, and its rationale, was stated in an oral opinion consuming another three pages of transcript. In part I said:

> The Court: If you wish to challenge whatever statement he made about the amount of time he had in college you may do so. If you wish to challenge what his grades were in various courses, you may not do so. And I'm cautioning you, Mr. Hill, that

I don't want you to ask a question which conveys any information about his grades.

Part of it has to do with the remoteness in time. We are talking about stuff that is more or less one generation in the past, and that makes a difference, but that would not in my mind suffice to keep it out in this particular case. What keeps it out in this particular case is that this is not, as I view his testimony, a case involving accounting principles in any respect....

What you have here is the rough equivalent of a police officer getting on a witness stand, as they used to do many, many years ago, and telling a jury how somebody ran a numbers bank; ... of a police officer talking about how narcotics importation operates.

It's quite clear that the only training this individual could have gotten in the field in which he is testifying already is the training he got in the course of working for his employer....

With respect to Ferguson, if all that is going to be said here ... is that Ferguson hoodwinked [Doe], I doubt very much that his academic performance would have anything to do with his ability to judge the credibility of Ferguson. And ... this jury heard Ferguson and will decide for itself whether Ferguson was telling the truth, and if Ferguson was lying, then they're going to have to throw out a lot of what [Doe] has to say anyway.

... The fact that [Doe] didn't do very well in his accounting courses is [no] indicia of how well he would do in buying a bill of goods from Ferguson.

I left open only the possibility that a defense expert (who was to be Mr. Rux) might show that academic excellence was relevant and, if that occurred, "then I would permit ... recall [of] Mr. [Doe] for ... further cross-examination."

What was Mr. Hill's response to this ruling?

Q. Was there a time when you had to matriculate at Wright Junior College, sir?[4]

---

3. A pseudonym.

4. This is a reference to the fact that the witness's academic performance years ago required him to depart DePaul.

A.   That is correct.

Q.   Would you tell the ladies and gentlemen of the jury why.

Mr. Safer: I object, your honor.

The Court: The objection is sustained.

Q.   [Mr. Hill]: Have you taken any accounting courses, sir?

A.   Yes.

Mr. Safer: Objection, Your Honor.

The Court: Mr. Hill come to the side.

Mr. Hill: I'm not getting into grades.

The Court: Mr. Hill, come to the side.

Ms. Scott: Judge—

The Court: Mr. Hill.

(Side bar conference:)

The Court: I find your comments, the asking of the question and your response to their objection to be in direct defiance of my ruling.

Mr. Hill: Judge, that was not my intent.

The Court: I don't care what your intent was, because it was in direct defiance. I also cannot believe it was not your intent because we went over this in great detail. What we are going to do is we are going to adjourn for a few moments and we are going to discuss your conduct.

(Before the jury:)

The Court: Take the jury out.[5]

(Jury excused.)

The Court: Come to the lectern. Tell me, Mr. Hill, what are you going to ask next?

Mr. Hill: I was specifically told that I could not ask him anything about his grades, and I didn't.

The Court: And you felt that—

Mr. Hill: I didn't ask him a word—

The Court: Mr. Hill.

Mr. Hill: —about his grades.

The Court: Mr. Hill, maybe one of the difficulties you have is that you begin talking before I finish and somehow perhaps you don't hear what I'm going to say. What you did is you said in the presence of the jury "I'm not asking him about his grades."

Mr. Hill: In response—

The Court: Mr. Hill—

Mr. Hill: —to their objection.

The Court: Mr. Hill, Mr. Hill, I'll tell you when you can talk.

Mr. Hill: Thank you, Your Honor.

The Court: That way we won't have any difficulty.

Mr. Hill: Judge, I'm not trying to be hostile, but I don't want to be intimidated, Judge.

The Court: Mr. Hill—

Mr. Hill: I don't want to be intimidated.

The Court: Mr. Hill, I'll tell you when you can speak.

Mr. Hill: Yes, sir.

The Court: Mr. Hill, remain at the lectern. You then said in the presence of the jury, "I'm not going to ask him about grades." There is no way that the jury could fail to draw an implication that you intended to ask questions or that you wanted to ask questions about grades. You conveyed to the jury at least the idea that there was some question about grades. And that I think was entirely inappropriate.

Moreover, I permitted you to ask a question which I thought was very close to the line, which is, "There came a time when you had to go to Wright Junior College," and the reason I permitted it is there could be a variety of reasons why a person would have to go to Wright Junior College rather than DePaul, one of which is, as I recall, the tuition at Wright Junior College is significantly less than the tuition at DePaul, because that question had no freight no negative freight to it.

The truth is you just did what you've done in a variety of cases in the course of this trial, which is to attempt to get by my rulings by stating this in the course of objections and responses to objections that convey to the jury information which I have told you you could not convey to them, I think that is wrong. I think it may very well be contemptuous of the

---

**5.**   Hill's response says that his conduct caused only a sidebar interruption. In fact, the jury had to be excused to proceed with a lengthy colloquy.

Compare *United States v. Oliver,* 470 F.2d 10, 13 (7th Cir.1972).

Court, but I make no finding on the question of contempt because I would postpone any hearing with respect to that until the end of this trial.

Now, Mr. Hill, if you have something to say, this would be the time to say it.

Mr. Hill: Yes. Jim Tunick and I would like to withdraw from this case at this point because I think that by virtue of your ruling I'm being intimidated to the point of where I can't effectively represent my counsel—I mean my counsel who happens to be my client.

Judge, that response was clearly in response to both of these lawyers jumping up. I'm not going to get into the details of it. It didn't—we know, we know it had nothing to do with finances. It had nothing to do with it.

I was told 22 years ago that in a federal district court the job of lawyer was to make sure that the truth came out, whether it was the defense lawyer or the prosecutor. I was a former assistant state's attorney, in fact I think I worked while you were in the office back in state court, and I learned I think from you even, because you used to give the seminars about defending your clients and let the chips fall where they may.

I'm not here trying to malign Mr. [Doe]. It was a hard thing for me to look into that. Not all of us are A students when we start out, and along the way we can, you know, get it better. But to be able to limit us in a federal district court in this state, of the United States, it seems to me, Judge, that's something wrong with the Sixth Amendment if the Sixth Amendment doesn't allow—and the government knew about it. Jim Tunick called me yesterday because we wanted to verify whether or not this was the same individual. He asked Ms. Scott whether or not his middle initial was M. We had to call. There was some delay in terms of who this individual was. At the time of the voir dire, because we suspected something, I asked for the man's personnel file.

Now, Judge, you know, I don't know what you'd have me do. I'm trying to do the best I can. I ended up with the case because one of my lawyer friends got sick, Marianne Jackson, with all due respect to Mr. Rux, whom I've known also.

But, Judge, I mean the jury should be able to hear from [Doe]. I'm sure they all weren't A students either. I wasn't. That doesn't mean you don't turn out to be something and be able to do your job. But I don't think that when you're dealing with a man that's got up on the stand, for example, Judge, and talked about Griffin's available income and talked about the inferences that he's drawing from it, that the jury shouldn't be allowed to hear the whole man. It's not just a snapshot of a man's life that's on trial. They should hear the whole picture, which is what I attempted to do with Ferguson. I attempted to let the jury judge the man and what he's doing and whether or not he should be believed and is there anything in his life that might impact on it. And I just don't think that's right.

I mean are we packaging cases so that juries make decisions that—that are devoid of what objective reality is? Objective reality says the man got Fs, he got Ds. That doesn't make him a bad man. But the jury should have that information, Your Honor. We got into it with Mr. Ferguson. There was no objections. We talked about all of Ferguson's degrees. He was a B student. No objection. And then all of a sudden the government—their main person, the person that they rely upon for the underpinnings of their entire prosecution against my client. And all I want to do, Judge, is ask whether or not he learned along the way. They can make the argument. They don't lose it.

I would not disrespect this Court's ruling. I know this Court's background; I know that you are interested in the truth coming out; and I know you know that these prosecutors know how to deal with that information. All they got to do is get up on redirect and say it was 20 years ago. So let's talk about the ten degrees you got working for IRS. I asked for that, Judge. I asked for his personnel record.

Do you have a good faith basis? Yeah, I got a good faith basis. He got two Fs in

economics. That's a good faith basis to find out how all of a sudden he's able to come on and become this star witness in a financial crimes case, which is pivotal with respect to Mr. Rux.

The whole case that they play out against Mr. Rux is based upon the inferences that he would have drawn from this testimony. And I would respectfully and I would humbly, Your Honor, humbly, ask that you reconsider—that you reconsider it. They talk about ten awards he received. He got an award in this, an award in that.

And then, Your Honor, I want to ask, well, sir you're getting these awards. How did you do in econ? How did you do in math? How did you do in African–American history that he got an F in? And how did you do in Reflections on God and religion that he withdrew from? Maybe that explains why they objected to Matthew 16:18.

Look, this country cannot be devoid of what the reality is, if we start trying cases, Your Honor, in this courtroom or any courtroom where we are afraid to let the agent be subjected to cross examination. It might be one thing if you're dealing with an old lady or a man like Colbert in a wheelchair, but we're talking about a policeman. He put his reputation on the line. I should be able to explore it.

And the jury, these people understand. They understand that. If the evidence—if the evidence is strong against Griffin I'm sure they'll—or Scurlock or Rux, they'll convict them. But should we be so protective of [Doe] that I can't ask him how did he do at a school where he said he had attended and where the government opened it up?

If they didn't want to get into DePaul and what he was doing back in '70, they should have started when he became an FBI—became a G man. They've opened the door. I've been told that when the door is opened, you are allowed to cross-examine within the scope of what's been opened and what's been given to you.

Judge, I respectfully, on behalf of Marvin Rux, I respectfully request that you allow me to represent him. It's a tremendous responsibility when you got another lawyer to represent. I mean it's hard. He's checking me out.

Allow me to represent my guy, Judge, please. I ask you humbly. I'm not contemptuous. I'm not. And if it came that way, I am a fighter. I was taught that when Bernard Carey hired us, Agran and me and others back in '73 those 40 assistant state's attorneys that were going to come out and clean up corruption. They were going to call it like they saw it. They weren't going to make no excuses for their agents and their witnesses. They were going to call it like they saw it.

I said in opening statement, if you believe Ferguson, lock Rux up; if you don't, let him go.

And I respectfully request at this time Judge, that you allow us to do the thorough . cross examination that's required. This jury is grown up enough to know that that was 20 years ago just like this Court knew. And I'm sure that all of them didn't get A's and B's and were honor roll students either. But it is some evidence and it is some evidence that I think [Doe] is strong enough to take and withstand.

We've got to protect FBI agents from cross-examination now? Please, Judge. I humbly request that you reconsider, and I hope that nothing that I have said has been meant to be contemptuous, because I'm saying it as humbly as I know how. Thank you.

The Court: Mr. Hill, the fact that you've reargued this motion, reargued this objection shows quite clearly to me that you're simply trying to get around the ruling. If you think my ruling is in error and your client is convicted, then you have a remedy.

Mr. Hill, I made my ruling. I want you to adhere to my ruling. I don't want to have to rule the same thing two or three times in a row. I don't want you to dance around the ruling and try to come close. I want you to adhere to the ruling. I want you to adhere to the ruling no matter how wrong you think the ruling is, because the system we have is based on the assumption

that the lawyer makes a motion, the judge grants it or denies it; the lawyer makes an objection, the judge sustains it or overrules it; and the lawyer must abide by that, no matter how wrong the lawyer thinks it is because the lawyer has another remedy. That remedy is if that lawyer's client loses the case, the lawyer can appeal and go to three judges who outrank the judge who has made the original ruling and say this was wrong; and if it is wrong, those judges will attempt to correct it; and if those judges make an error, you have a chance to go nine judges in Washington, D.C.

Now, the fact of the matter is it is a human system and it is possible that I could make an error here which would not be correct, but the truth is you simply have to obey my rulings, and there is no excuse not to obey my rulings.

And also the truth is that it's quite clear that you are from the form of your questions attempting to skirt the ruling. You must accept the ruling once it is made. And the truth is that nobody in any courtroom in the United States really advocates the position as you seem to have done in this case that the jury ought to hear everything.

As I recall, Mr. Hill, in this case and in other cases before me you've objected to evidence that was the truth because you thought for a variety of reasons it was—it was prejudicial or inadmissible. Every lawyer does that. We don't have a let-it-all-hang-out in the courtroom. We have a whole bunch of rules from which sometimes your client benefits and sometimes your client doesn't benefit. You must obey my ruling.

Now, if your position is that you cannot continue to represent Mr. Rux because you are intimidated by the fact that I will not permit you to disobey my rulings, Mr. Hill, I have two difficulties. First of all, I don't believe that you are intimidated; and, second of all, if I did believe that you were intimidated, you are telling me not that you are not competent to represent Mr.

Rux, you're telling me you're not competent to be a lawyer at all, because every time you go into court you are going to have objections and rulings that are against you, and a fair number of those times you are going to think that they're wrong and you're going to have to comply with those rulings.

If you can't comply with those rules, it's not representing Mr. Rux that's the problem here, it's representing anyone that's the problem here.

Now, I expect you to comply with my rulings and we will deal later with what has happened thus far with respect to this ruling. Comply with my rulings whether you like them or not. Don't try to dance close to the line. Deal with those subjects where I have permitted you, at least where I have not ruled against you. And I have ruled against you on this time—on this occasion and I made it very clear and I gave you as full a chance as I could to argue this.

The truth is that Mr. Hill was not, in the slightest, intimidated [6] and his statement to the Court that he was intimidated was a knowing falsehood. Apart from his unintimidated demeanor and my judgment of his credibility, he continued a pattern of asking questions that he knew, on the basis of prior rulings, were objectionable (R. at 2297, lines 17–25; R. at 2317, line 17 through R. at 2318, line 12; R. at 2318, line 23 through R. at 2319, line 2; R. at 2334, lines 18–24). Nor did he desist from offering insincere justifications for his interrogation. In one instance, Mr. Hill wanted Mr. Doe to opine that Mr. Rux's financial machinations did result in some good deeds, *i.e.,* people who would have lost their homes did not do so or, at least, postponed the loss. Such opinions were beyond the scope of Mr. Doe's testimony, not really the subject of expert opinion evidence.

Mr. Hill: And as a result of the efforts of Mr. Rux she and her daughters continued to live there at least for five to six years longer than they would have?

Mr. Safer: Your Honor—

The Court: Mr. Hill, come to the side.

---

6. Indeed, the record cannot convey adequately the sly satisfaction in Mr. Hill's demeanor when he managed to say, clearly in the jury's hearing, "I'm not getting into grades."

(Side bar conference:)

The Court: Don't make your argument in questions. You're asking about stuff on which there is no—

Mr. Hill: But see—

The Court: I'm not done.

Mr. Hill: I'm sorry.

The Court: —on which there is no dispute.

Mr. Hill: But can't I question that—

The Court: No, you can't question stuff that's not in dispute. I'm not going to let you talk about stuff that's not in dispute.

Mr. Hill: Well, Judge—

The Court: She said what she said. You're asking—

Mr. Hill: Can I tell—

The Court: Not until I'm done. You're asking him to comment on what some other witness says because you want to make a point, and the point you want to make is that Mr. Rux is a great man because Mr. Colbert's still in his house and this person is still in her house. I know what you're doing and the jury knows what you're doing, and I don't understand why you're persisting in trying to tell me it's not what you're doing.

Mr. Hill: Judge, they indicated that they offered him not as a fact witness but as someone to provide opinions. Now, when they put somebody out on opinions, I'm allowed to get into his opinions.

The Court: Mr. Hill, it's difficult for me to believe you're offering that rationale in good faith.

Mr. Hill: That's what he said on his objection.

The Court: I'm sustaining the objection. And put that chart away, too.

Mr. Hill: Okay.

Nor was he deterred from trying to introduce evidence that other persons who might be guilty were not charged, evidence which, I believe, Mr. Hill knew to be inadmissible:

Q. That's 1120 corporate tax return. You recall, that's the one that was prepared by Cyrus Walker, correct?

A. The one for Caesar's Mini Mart?

Q. Yes.

A. Yes. What about—

Q. By the way, Mr. Walker was never indicted or given immunity was he?

Mr. Safer: Objection, Your Honor.

The Court: Mr. Hill, the cases of other defendants—

Mr. Hill: Okay.

The Court: —are simply—

Mr. Hill: He is not a defendant, Judge, Walker.

The Court: The question of other potential defendants in other possible cases is simply not before this jury.

Mr. Hill: Okay.

The defense to all this is, "I was just doing the best I can to represent my client, in the highest tradition of American advocacy." I actually doubt that refusing to follow rulings and being untruthful to the court is in the highest traditions. Maybe they are so widely accepted that the defense is colorable, to be made with a straight face. But I hold that they are not proper undertakings for an advocate. There is too much today of ignoring the law for the greater good, perhaps on both sides of criminal cases, and it ought to stop.

Mr. Hill's closing argument was sometimes based on nothing but speculation and he misstated evidence and the events of the trial. Some of this rehearsed what had gone on before and some of it was deliberate, but I do not pause to sort each item out because I judge in closing argument Mr. Hill's missteps were largely attributable to the emotional momentum of the closing argument process. His demeanor during closing argument bespoke more sincerity than his earlier demeanor which bespoke deliberate evasion.

■ I therefore find beyond a reasonable doubt that Mr. Hill has committed direct contempt of court with the specific intent to prejudice a fair and impartial proceeding in the following ways:

1. Refusing to abide by the rulings of the Court with respect to the admissibility of the fact that the government did not ask Kevin Moss to give certain expert testimony.

2. Misrepresenting to the Court that he did want Kevin Moss to examine records and

state opinions when Mr. Hill knew he wanted neither of these things.

3. Refusing to abide by the Court's ruling that William Doe's academic performance was inadmissible.

4. Misrepresenting to the Court that he was intimidated by the Court's rulings when he was not intimidated and he knew he was not intimidated.[7]

 The question then is what is appropriate punishment. Money comes into mind, but this case took a lot of time and effort by Mr. Hill for which, as appointed counsel,[8] he will be inadequately paid. I do not want to assess a nominal fine because a nominal fine would imply that the conduct was not serious. So I issue this Opinion as a written condemnation of Mr. Hill's conduct and I order that the Opinion be published.

---

7. The claim that an experienced trial counsel like Mr. Hill is "intimidated" may sometimes be true, although when it is true I doubt that it is readily made. But often it is only a ploy designed to say to the judge, "If you don't stop ruling against me, and enforcing these rulings, I am going to say something that will make the record look awful, so give me some leeway." In this case the claim of intimidation was made as a ploy; Mr. Hill didn't believe it when he said it.

8. Originally he was retained, but his client could no longer afford his services and I appointed Mr. Hill.